# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| REBECCA O., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-1362 |
| | ) | |
| MARTIN J. O'MALLEY, Commissioner | ) | |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER & OPINION

This matter is before the Court on motion of Plaintiff Rebecca O. ("Plaintiff") to reverse or remand the final decision of the Social Security Commissioner ("Commissioner") denying her benefits. (Doc. 12). Defendant Commissioner provided a Brief in opposition (doc. 16), seeking to uphold the decision to deny benefits, and Plaintiff replied (doc. 17). The matter is therefore ripe for review. For the following reasons, the Court affirms the decision of the Administrative Law Judge ("ALJ").

### PROCEDURAL BACKGROUND

Plaintiff Rebecca O. filed an application for Supplemental Security Income ("SSI") on August 10, 2018, and for Childhood Disability Benefits ("CDB") on August 23, 2018, alleging an onset date of January 1, 2009. (R. at 15).[1] The Social Security Administration denied Plaintiff's application initially on October 17, 2018, and again on reconsideration on February 5, 2019. (R. at 15, 100–28). Plaintiff requested a

---

[1] Citation to "R. at __" refers to the page in the certified transcript of the record of proceedings provided by the Social Security Administration.

hearing before an ALJ, which took place on December 4, 2019. (R. at 35–82). On April 29, 2020, the ALJ issued a decision concluding Plaintiff was not disabled and, therefore, ineligible for disability benefits. (R. at 12–34). The Social Security Administration Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision final. (R. at 1). Plaintiff appealed her case to this Court, which granted a joint motion for remand on January 5, 2022. (R. at 3456–62). On remand, the ALJ was instructed to give further consideration to the medical source opinions and Plaintiff's maximum residual functional capacity. (R. at 3463–68). After a hearing on December 22, 2022, the ALJ issued a decision that again concluded Plaintiff was not disabled. (R. at 3388–426, 3362–87). Plaintiff filed the instant Complaint on September 22, 2023. (Doc. 1).

## FACTUAL BACKGROUND

On her alleged onset date, Plaintiff was seventeen years old; therefore, she had only marginal education and no past relevant work. (R. at 3371). The following is a summary of Plaintiff's medical records[2] submitted to the ALJ, the hearing before the ALJ on February 7, 2023, and the decision of the ALJ dated February 20, 2023. While

---

[2] As stated, Plaintiff has applied for two types of benefits: SSI and CDB. In order to qualify for CDB, Plaintiff must establish that she was disabled between the ages of eighteen and twenty-two. 20 C.F.R. 404.350(a). That would require Plaintiff to submit medical evidence for the period of April 2009 to April 2013. However, there were no records submitted for this period, and Plaintiff makes no explanation in her Brief as to why this Court should find her entitled to CDB despite the lack of medical evidence. Plaintiff has the burden to provide medical evidence establishing her disability; as she has not done this, the Court affirms the ALJ's decision to deny her CDB claim. *See Courtney F. v. Kijakazi*, No. 1:21-CV-02943, 2023 WL 110232, at *9 (S.D. Ind. Jan. 4, 2023) ("It remains a claimant's burden of submitting medical evidence establishing her impairments.") (citation and internal quotation marks omitted).

Plaintiff submits medical evidence dating back to 2015, her first month of eligibility is September 2018. *See* 20 C.F.R. 416.335 (setting the earliest date of eligibility as "the month following the month" of application for Title XVI claims requesting SSI). The Court has reviewed the record in its entirety but will focus on the relevant period.

## I.   Summary of Plaintiff's Medical History

The medical record reveals Plaintiff has diagnoses for various mental impairments like affective disorder, anxiety disorder, post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity disorder ("ADHD"), and substance use disorder. She has sought medical treatment for some physical ailments, like general back pain. During the period at issue, Plaintiff saw various medical providers, including and of note, Sherri Bowald ("NP Bowald"), a psychiatric mental health nurse practitioner, Briana Flori ("APN Flori"), an advanced practice nurse, and Megan Amdor ("Case Manager Amdor"), a social services provider.

When Plaintiff began seeing NP Bowald in September 2017, she had several recent trips to the emergency room for an intentional overdose, suicidal ideations, panic attacks, anxiety, and depression. (*See, e.g.*, R. at 3813, 2698, 1472, 1388–89, 1351, 1931). Some of Plaintiff's trips to the emergency room required her to stay at the hospital for a period of time. (R. at 1470, 2485, 1369–70). NP Bowald took over Plaintiff's medication management at the Institute for Human Resources; however, she did not treat Plaintiff again until July 2018. (R. at 2571, 2572). At that time, Plaintiff informed NP Bowald of her relationships with family members, and was anxious with rapid speech. (R. at 2572). Later that year, in October, NP Bowald noted Plaintiff's similar presentation but greater impulse control demonstration. (R. at

2574). While she presented as well-groomed and displayed appropriate coping skills, she also had increased depression due to a family matter. (R. at 2574). Her next visit to NP Bowald in December 2018 followed an emergency room visit, where she reported anxiety due to her children being removed from her care. (R. at 2575).

In April 2019, Plaintiff visited NP Bowald and reported difficulty with activities of daily living, such as performing chores. (R. at 2576). Around the same time, Plaintiff began court-mandated therapy with a different provider. (R. at 2577). She next spoke to NP Bowald in July and was documented to have loud and rapid speech. (R. at 2579). Less than a week after, Plaintiff visited an emergency room, complaining of panic attacks, but reported improvement after receiving medication. (R. at 2464–67). In October 2019, NP Bowald completed medical opinion forms and wrote an additional letter where she provided her opinion on Plaintiff's functionality. (R. at 2476–78, 2605).

In January through March of 2020, Plaintiff attended case management services with Paige Sveda ("Case Manager Sveda") where she reported feeling well, and was taking her medications, but also reported family issues, like a physical altercation with her mother and concerns over her boyfriend's health. (R. at 3656–61). Plaintiff spoke with NP Bowald in June 2020 and reported increased anxiety due to losing parental custody of her daughter; in response, NP Bowald modified her prescriptions. (R. at 3663). In July 2020, NP Bowald recorded Plaintiff had decreased symptoms and no panic attacks in over a month. (R. at 3672). A few months later, in October, Plaintiff again reported being in a good mood. (R. at 3682). After a series of

cancellations, Case Manager Sveda complained of Plaintiff's failure to attend her appointments, and advised Plaintiff that she needed the sessions to develop her social skills. (R. at 3668). Plaintiff saw Case Manager Sveda frequently throughout the next few months, and the sessions consisted of social activities or discussing Plaintiff's life. (R. at 3669–71, 3673–81, 3683–89). Case Manager Sveda recorded Plaintiff's positive moods, appropriate interactions with the public, and consistency taking her medications. (R. at 3685, 3686, 3687).

In January 2021, both Case Manager Sveda and NP Bowald started to discuss finding an apartment with Plaintiff. (R. at 3689–90). The next month, Case Manager Sveda noted that Plaintiff had difficulty acting appropriately during the meeting. (R. at 3693). In March 2021, Case Manager Sveda told Plaintiff that she was leaving her role, and while Plaintiff displayed some manic behaviors, she "took this news well." (R. at 3696). When Plaintiff was transferred to Case Manager Amdor, she presented with rapid speech and was acting inappropriately. (R. at 3698). However, a week after the transfer, Plaintiff reported her mood as stable to NP Bowald. (R. at 3699). During their first session in April 2021, Case Manager Amdor noted that Plaintiff did well in public, needing only "minimal instructions and advisement." (R. at 3700). In May, Plaintiff reported to NP Bowald that her mood improved after adopting a kitten. (R. at 3701). NP Bowald adjusted Plaintiff's medications. (R. at 3701). In her sessions with Case Manager Amdor, Plaintiff reported calling a suicide hotline over the previous weekend but denied having suicidal ideations at the time of their appointment. (R. at 3702–06).

Case Manager Amdor attended Plaintiff's first appointment with APN Briana Flori (who replaced NP Bowald) to help Plaintiff vocalize her needs. (R. at 3708). At the meeting, Plaintiff complained of hypersomnia and anxiety but declined the majority of APN Flori's medication adjustments. (R. at 3708). Later, in July and August 2021, Plaintiff informed Case Manager Amdor about her decision to move out of her boyfriend's home and was initially upset when she learned that a different patient was prioritized in housing placement, but presented as stable at the following appointment. (R. at 3715, 3718, 3720). During a visit with APN Flori in October 2021, Plaintiff reported increased energy due to an iron supplement, although she continued to experience symptoms of anxiety and depression due to her current living situation. (R. at 3729). The next month, Plaintiff reported a poor mood to Case Manager Amdor; however, during a follow-up appointment a week later, Plaintiff was engaged and talkative. (R. at 3730, 3731).

In December 2021, Case Manager Amdor helped Plaintiff move into her new apartment. (R. at 3734, 3735). This required Plaintiff to complete paperwork, interview with the apartment complex, and perform other various tasks—Case Manager Amdor noted that while Plaintiff easily gets overwhelmed and anxious in public, she expressed a sense of accomplishment in being able to remove herself from the difficult living situation. (R. at 3724, 3734, 3736). Throughout January 2022, Case Manager Amdor and Plaintiff worked on coping strategies so Plaintiff could feel more comfortable staying in her apartment alone. (R. at 3738). That same month, Plaintiff informed APN Flori that she did not receive her medications and that her worsened

anxiety was improved at the time of her visit. (R. at 3794). Plaintiff reported staying in her apartment alone at the end of the month. (R. at 3741).

From February to April 2022, Plaintiff worked with Case Manager Amdor to cope with moving the last of her possessions into her apartment, incidents with her family members, and her cat passing away. (R. at 3744, 3745). Plaintiff reported anxiety, depression, and an unstable mood, and admitted not taking her full dose of medication. (R. at 3746, 3747). However, by July 2022, Plaintiff reported an increased mood and decreased symptoms. (R. at 3762). At that time and onward, Plaintiff's symptoms were manageable with medication and case management, and she ended her relationship with her previous boyfriend, which significantly decreased her anxiety symptoms. (R. at 3747, 3762). She reported attending church and volunteering at the Humane Society and was documented as being less manic. (R. at 3750–69). Case Manager Amdor reported Plaintiff was able to interact with others appropriately and could "accomplish what she needed to do with minimal impact to functioning." (R. at 3749). APN Flori completed a medical opinion form on December 16, 2022, while Case Manager Amdor provided her opinion in an undated form. (R. at 3802–04, 3805–07).

## II.   Hearing before the ALJ

On December 22, 2022, Plaintiff appeared via telephone before an ALJ to testify about her mental impairments. (R. at 3388–426). She was represented by an attorney, and a vocational expert ("VE") was present to testify. (R. at 3390). Case Manager Amdor was present for moral support. (R. at 3391).

7

To begin, Plaintiff provided general information—she lives on her own but has never had a driver's license or completed her high school diploma. (R. at 3395–96). Plaintiff testified about how her appointments with Case Manager Amdor have helped her remain stable. (R. at 3402–03, 3410–11). Plaintiff spoke about her previous boyfriend, and her past drinking and substance abuse problems. (R. at 3406–07). She adopted a cat, has a friend in her apartment building, and volunteers at the animal shelter—activities she reported to help with anxiety. (R. at 3410–11).

As to her cognitive abilities, Plaintiff testified that she can read but has difficulty with comprehension; she can add and subtract but is unable to do multiplication or division. (R. at 3397). She explained how she is unable to retain employment due to panic attacks and answered questions related to the few jobs she attempted to work. (R. at 3397, 3402–03). With respect to physical difficulties, Plaintiff spoke about back pain and how she is unable to lift more than thirty pounds. (R. at 3397–98). Plaintiff testified about how her weight contributes to pain in her ankle. (R. at 3399). She then detailed how she experiences mood swings, panic attacks, bipolar disorder, anxiety, and PTSD, and the medications she takes to manage each. (R. at 3400–02). Plaintiff confirmed that her medications are "very effective" for her symptoms, and that she experiences few side effects. (R. at 3401).

After Plaintiff testified, the VE provided testimony consistent with the Dictionary of Occupational Titles. (R. at 3416–22). The VE was asked by the ALJ to provide examples of medium and light work appropriate for a hypothetical person with the same characteristics as Plaintiff, who can understand and remember simple

8

instructions, who is limited to performing simple, routine tasks on a sustained basis with only routine breaks, whose work involves no more than ordinary or routine changes, and who should only have occasional contact with supervisors, coworkers, or the public. (R. at 3416). For medium work, the VE stated that this hypothetical person would be able to perform the job of a warehouse worker and that 67,000 of those jobs were available in the national economy. (R. at 3416–17). For light work, the VE suggested an assembler, and roughly 30,000 of those jobs were available in the national economy. (R. at 3417).

The ALJ next asked the VE to consider further limitations—such as avoiding climbing, stooping, kneeling, and other postural activities no more than occasionally, avoiding reaching overhead no more than occasionally, avoiding exposure to vibration or hazards such as dangerous machinery, and avoiding interaction with the public with no more than an occasional interaction. (R. at 3417–18). The VE replied that this hypothetical person could still perform work as an assembler, but also as a commercial cleaner or housekeeper, and suggested that the number of those available jobs is 50,000. (R. at 3419). However, the VE opined that if the person had a level of unexcused absences, lateness, leaving work early, or being off task, there would likely be no competitive employment in the national economy. (R. at 3420). The ALJ next asked the VE of any light, unskilled jobs that would not require the hypothetical person to have any contact with coworkers or the public, and the VE responded that there are no such jobs. (R. at 3421).

Plaintiff's attorney then asked the VE whether any job would exist if the hypothetical person was unable to tolerate standard forms of instructions or criticisms, and the VE stated that there would be no jobs in a competitive workplace for this person. (R. at 3422). Plaintiff's attorney then inquired about further considerations, such as the person having a panic attack or crying outbursts that could cause a distraction for coworkers, and whether such would be tolerated in an unaccommodated work setting; the VE responded in the negative. (R. at 3422). Finally, when asked whether an emotional-support companion would be tolerated in an unaccommodated work setting, the VE also responded in the negative. (R. at 3422).

## III.   Decision of the ALJ

A five-step sequential analysis is employed to determine whether a plaintiff is disabled. 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 137 (1987). At step one, the ALJ determines whether the plaintiff is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). At step two, the ALJ determines whether the plaintiff's impairments are severe. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if it significantly limits the plaintiff's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). At step three, the ALJ determines whether any of the plaintiff's impairments, alone or in combination, meet or equal one of the Listings in Appendix 1 to Subpart P of Part 404 of C.F.R. 20 C.F.R. § 404.1520(a)(4)(iii). At step four, the ALJ evaluates the plaintiff's residual functional capacity ("RFC") and determines whether the plaintiff can perform past relevant work based on the RFC. 20 C.F.R. § 404.1520(a)(4)(iv). The RFC represents the most a plaintiff can do given his limitations. 20 C.F.R. § 404.1545(a). An RFC includes limitations for all medically

10

determinable impairments, including non-severe impairments. 20 C.F.R. § 404.1545(a)(2). Finally, at step five, the ALJ determines whether the plaintiff can perform other work. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ may require the testimony of the VE to make a step-five determination. The burden of proof is on the plaintiff for the first four steps; it then shifts to the Commissioner for the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

Applying the five-step inquiry, the ALJ here concluded Plaintiff was not disabled from January 1, 2009, through the date of the decision. (R. at 3366). The ALJ did find Plaintiff's affective disorder, anxiety disorder, PTSD, and history of ADHD and substance use disorder as medically determinable severe impairments under 20 C.F.R. § 404.1520(c). (R. at 3368). However, all other impairments were found to be "non-severe or non-medically determinable as they have been responsive to treatment [and] cause no more than minimal vocationally relevant limitations." (R. at 3368). The ALJ found none of Plaintiff's impairments, individually or in combination, met the requirements listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (R. at 3369). While Plaintiff has no relevant past work experience, the ALJ found that she could adjust to work that exists in significant numbers in the national economy. (R. at 3378). In making this finding, the ALJ discounted the work-preclusive opinions from NP Bowald, APN Flori, and Case Manager Amdor, and made the following RFC determination:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations. She can understand and remember simple

instructions and due to deficits in memory, concentrated, persistence and pace, she is reasonably limited to performing simple and routine tasks on a sustained basis with only routine breaks. Any work should not involve more than ordinary or routine changes in work setting or duties. Any work should not require more than occasional contact or interaction with the general public, supervisors, or co-workers.

(R. at 3370).

## LEGAL STANDARD

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the ALJ's decision, this Court must uphold the ALJ's findings of fact if the findings are supported by substantial evidence and no error of law occurred. *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. The Court is obligated to "review the entire record, but [does] not replace the ALJ's judgment with [its] own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility." *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020).

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). It is the ALJ's responsibility to "build an accurate and logical bridge from the evidence to her conclusion," and the ALJ "may not ignore evidence that undercuts her conclusion." *Spricher v. Berryhill*, 898 F.3d 754, 757 (7th Cir. 2018) (citations and internal quotation marks omitted). The ALJ is required to articulate only a minimal, but

legitimate, justification for her acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). At the same time, judicial review is not abject; the Court does not act as a rubber stamp for the Commissioner. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010).

### DISCUSSION

Plaintiff raises numerous arguments to explain how the ALJ erred in determining her not eligible for disability benefits. The dispute centers on whether the ALJ properly evaluated the medical opinion evidence and assessed Plaintiff's work-related limitations. (Doc. 12 at 20–22). Additionally, Plaintiff contends that the ALJ should have sought clarification from the medical providers before dismissing the opinions as inconsistent and unsupported. (Doc. 12 at 23–24). Plaintiff's primary relief requested is to remand this case for further consideration. (Doc. 12 at 24). The Commissioner, in opposition, argues Plaintiff has not demonstrated error on the part of the ALJ. Instead, the Commissioner states the ALJ used substantial evidence to support his evaluation of the record and opinion evidence. (Doc. 16 at 2–8). The remaining arguments asserted by Plaintiff lack merit and are not supported by relevant case law, according to the Commissioner. (Doc. 16 at 8). For relief, the Commissioner seeks affirmance. (Doc. 16 at 8).

### I.    Evaluation of the Medical Opinion Evidence

Plaintiff argues that the ALJ did not meaningfully address the supportability and consistency of the medical opinions provided by NP Bowald, APN Flori, and Case Manager Amdor, instead dismissing them as "check-box responses without specific

13

citations to the record." (Doc. 12 at 22). The Commissioner, in response, argues that the ALJ sufficiently met the requirements under the Act. (Doc. 16 at 2).

A "medical opinion" is a statement from a medical source about what the claimant can still do despite her impairments and whether she has impairment-related limitations in her ability to perform the physical or mental demands of work activities. 20 C.F.R. § 404.1513(a)(2). The ALJ will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinions or prior administrative medical findings, including those from the claimant's treating providers. 20 C.F.R. § 404.1520c(a). Instead, the ALJ will articulate how "persuasive" he finds all of the medical opinions and prior administrative medical findings in the case record. The factors of "supportability" (the more support the source offers, the more persuasive the opinion will be) and "consistency" (the more consistent the opinion is with the other evidence, the more persuasive it will be) are the most important in determining how persuasive the ALJ finds a source's medical opinions or prior administrative medical findings to be. 20 C.F.R. § 404.1520c(b)(1), (c)(1). ALJs are required to consider the objective medical evidence when evaluating the supportability and consistency of a medical opinion. 20 C.F.R. § 404.1520c(c)(1)–(2).

NP Bowald provided her medical opinion in three check-box questionaries and one letter. (R. at 3374). The first survey related to anxiety, dated October 7, 2019, indicated that Plaintiff demonstrated restlessness, irritability, panic attacks, difficulty concentrating, persistent worry, and disproportionate anxiety in leaving the home and attending appointments. (R. at 2478). NP Bowald opined that these

14

findings, along with an involuntary, time-consuming preoccupation with intrusive thoughts due to anxiety, caused marked limitations in understanding, interacting with others, concentrating, and adapting or managing herself. (R. at 2478).

On October 8, 2019, NP Bowald completed two additional questionnaires related to Plaintiff's trauma, stress, depression, and bipolar disorder. (R. at 2476, 2477). She marked that Plaintiff had clinical findings of depression, including depressed mood, diminished interest in activities, sleep and appetite disturbance, psychomotor agitation, decreased energy, difficulty concentrating, and thoughts of suicide or death. (R. at 2476). Plaintiff's clinical findings related to her bipolar disorder included pressured speech, flight of ideas, irritability, decreased need for sleep, and distractibility. (R. at 2476). The form provides that Plaintiff's depression caused mild or moderate impairment in understanding, remembering or applying information, and marked limitation in interacting with others, concentrating, persisting and maintaining pace, and adapting or managing herself. (R. at 2476). The questionnaire form related to trauma and stress indicated Plaintiff had a mild or moderate impairment in understanding, remembering, or applying information, and marked impairments in interacting, concentrating, and adapting or managing herself. (R. at 2477).

NP Bowald also wrote a letter dated October 28, 2019. (R. at 2605). It detailed Plaintiff's diagnoses of Unspecified Bipolar and Related Disorder and PTSD, and her symptoms including racing thoughts, depression, and anxiety. (R. at 2605). NP Bowald went beyond Plaintiff's medical history, and discussed her financial and legal

issues, as well. (R. at 2605). Her opinion was that Plaintiff's mental health condition cause her issues with sleep and controlling her anger and described recent medication changes to assist with these ongoing issues. (R. at 2605).

A few years later, on December 16, 2022, APN Flori completed a questionnaire as to Plaintiff's functional capacity. (R. at 3802–04). APN Flori described Plaintiff's symptoms as progressive anxiety and difficulty with focus, concentration, and memory, and executive dysfunction. (R. at 3802). She indicated that Plaintiff would not be able to consistently maintain attention for two hours and would require a break every thirty minutes due to her mental impairments. (R. at 3802). APN Flori opined that Plaintiff would miss two to four days of work per week and would be late two days per week. (R. at 3802). The form shows that APN Flori is of the opinion that Plaintiff would be incapable of understanding, remembering, and carrying out detailed instructions, accepting instructions and responding appropriately, and dealing with stress. (R. at 3803).

The last questionnaire was completed by Case Manager Amdor. (R. at 3805–07). She described Plaintiff's anxiety as moderate to severe and opined that Plaintiff's mental impairments would cause her to consistently be distracted, need a break every fifteen minutes, miss three to four days of work per week, and be late every day. (R. at 3805). She checked boxes to indicate that Plaintiff would be incapable of understanding, remembering, and carrying out instructions, having an ordinary routine, working in proximity to others, interacting appropriately with others,

16

accepting instructions or criticism, responding to change, and setting goals. (R. at 3806).

The ALJ ultimately found the opinions of Ms. Bowald, APN Flori, and Case Manager Amdor to be unpersuasive, labeling them as generalizations, and finding the opinions to be unsupported by the objective medical evidence and inconsistent with the record in general. (R. at 3375). In his decision, the ALJ noted that while all three providers had an established relationship with the Plaintiff, they provided "relatively generic" answers to the questionnaires and listed the Plaintiff's symptoms without citing specific objective evidence. (R. at 3375). The ALJ found the opinions that Plaintiff would be unable to meet workplace standards of neatness to be inconsistent with the treatment records describing how Plaintiff presented with good hygiene. (R. at 3375). Further, according to the ALJ, the record did not support the contention that Plaintiff exhibited suicidal thoughts or struggled with focus, concentration, memory, executive functioning, or startle responses. (R. at 3375). Relatedly, the ALJ found "Ms. Bowald's assessment of marked limitations or Ms. Flori and Ms. Amdor's opinions that [Plaintiff] would need frequent breaks or have frequent interference in several areas of work-related abilities and aptitudes" to be inconsistent with and unsupported by the record. (R. at 3375).

In the end, the ALJ concluded that the totality of the treatment record—including the providers' treatment notes, Plaintiff's clinical presentations, and her reported and observed functionality—did not support the significant work-preclusive limitations in the opinions. (R. at 3375). Instead, the ALJ pointed out that the

treatment records showed Plaintiff maintained stability and functionality with medication and case management. (R. at 3375). Even when Plaintiff encountered stressors, the ALJ found that she utilized coping mechanisms, managed her personal business, and did not experience "exacerbation of her symptoms or interference in her functioning." (R. at 3375).

Plaintiff takes issue with this analysis for various reasons. She first suggests that the ALJ repeated the same errors found in his first decision. (Doc. 12 at 21–22). Plaintiff recounts what the ALJ wrote, summarizes it as a "longer way of saying" that the medical opinions were unpersuasive because the check-box forms lacked specificity, and argues that this is the same reasoning the Appeals Council found insufficient. (Doc. 12 at 21–22). She describes how the ALJ's reasoning failed to consider how the opinions were consistent with one another and Plaintiff's self-reports—in other words, according to Plaintiff, the ALJ did not adequately explain the lack of supportability or consistency in his decision. (Doc. 12 at 22). The ALJ is accused of offering "an evaluation that is simply unreasonable and incompatible with the medical record" and ignoring the part of the record which supported a finding of disability. (Doc. 12 at 22–23).

The Court generally disagrees with Plaintiff's arguments. When reviewing, "[t]he court applies a common-sense reading to the entirety of [the] decision." *Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019). This means the decision is read "as a whole." *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004). Specifically responsive to the remand order, the ALJ focused on analyzing NP Bowald's medical opinion, and

reviewed the additional record evidence provided by Plaintiff. (R. at 3371). The ALJ cited evidence from over three years' worth of medical appointments between Plaintiff and the her providers before explaining why he found the respective opinions inconsistent with and unsupported by the record. He referenced the treatment records in which the providers documented Plaintiff's symptoms to be controlled by medication, how she remained able to function in the face of stressors, and that she generally presented as stable. (R. at 3372–74). The ALJ described how Plaintiff was able to overcome the stressors related to moving into her own apartment. (R. at 3371–74).

As an ALJ may not "ignore an entire line of evidence contrary to its ruling[,]" *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022), the decision also summarizes treatment notes describing Plaintiff's anxiety, depression, low energy, and inappropriate behavior, (R. at 3372–73). He discussed Plaintiff's history with her previous boyfriend, alcohol use, substance abuse, and parental custody, and how those factors contributed to her anxiety and other symptoms. (R. at 3372–74). He explained how Plaintiff's providers connected psychosocial stressors to her symptoms in their treatment notes. (R. at 3373). If Plaintiff complains that the ALJ failed to mention every last symptom Plaintiff experienced over the past few years, the Court reminds her that an ALJ "need not address in writing every shred of evidence." *Winkelman v. Saul*, 835 F. App'x 889, 891 (7th Cir. 2021). There is no requirement that an ALJ must "fully summarize the record" or provide "support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir.

19

2024) (citations omitted). If Plaintiff takes issue with the analysis, she must do more than simply ask this Court to reweigh the evidence in her favor. *See Dzafic v. Kijakazi*, No. 22-2090, 2023 WL 2536340, at *5 (7th Cir. Mar. 16, 2023) ("[C]laimants cannot simply point to evidence the ALJ considered and rejected and ask this court to infer greater limitations from it. Instead, they must engage with the ALJ's analysis and show why it was either illogical or unsupported.").

After recounting the record, the ALJ explained what each provider (NP Bowald, APN Flori, and Case Manager Amdor) indicated in the opinion questionnaires. (R. at 3374–75). Each opinion contained significant work-preclusive limitations without objective supporting evidence, and in discounting them, the ALJ provided examples as to how the opinions were inconsistent with and unsupported by their own treatment notes with citations to the record.[3] (R. at 3375). His analysis was

---

[3] Although, Plaintiff's issue with the ALJ's discussion on suicidal ideations has some merit. His conclusion that the medical opinions were inconsistent with the record as it relates to Plaintiff's history of suicidal ideations was not supported by substantial evidence. It seems the ALJ ignored that in May 2021, Plaintiff reported calling a suicide hotline for assistance after she experienced thoughts of ending her life, and that Case Manager Amdor encouraged her to call the hotline when this happened. (R. at 3702). Additionally, NP Bowald's notes chronicle that Plaintiff experienced suicidal ideations that same month, but that Plaintiff denied any lingering thoughts at the time of their appointment. (R. at 3701). Plaintiff's Brief references a hospitalization related to suicidal ideations around this time. (Doc. 12 at 12). However, Plaintiff and her attorney were informed that the ALJ did not have the medical records related to the incident and were told to submit documentation. (*See* R. at 3422, 3366). The ALJ granted four extensions of time to file such documentation; Plaintiff instead filed a letter confirming that no such records existed. (R. at 3366).

The ALJ's conclusion that Plaintiff did not exhibit suicidal ideations during the period at issue is incorrect; however, this is error is harmless. An error is harmless "if the error leaves us convinced that the ALJ would reach the same result on remand."

supported by substantial evidence, as this Court can trace the ALJ's reasoning from the evidence to his conclusion. *See Grotts*, 27 F.4th at 1278 (writing that a court does "not review medical opinions independently but rather review[s] the ALJ's weighing of those opinions for substantial evidence," and only "overturn[s] that weighing if no reasonable mind could accept the ALJ's conclusion"). Here, the ALJ complied fully with what the remand order required of him. *See* 20 C.F.R. § 404.977(b) ("The administrative law judge shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's remand order[.]"). Plaintiff's first arguments related to the ALJ's supportability and consistency analysis are meritless.

Plaintiff also takes issue[4] with the ALJ's finding that her stable functioning was not a mark of needing serious limitations—she argues that the "lack of

---

*Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018). If this Court can "predict with great confidence what the result on remand will be," then it may decline to remand. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). As this was one of many of the ALJ's considerations made when weighing the consistency and supportability factors, the Court concludes the ALJ would more than likely reach the same result if remanded.

[4] In the same line of reasoning, Plaintiff points out that the three medical opinions were consistent with each other and her own self-reports. (Doc. 12 at 22). However, she does not provide the Court with a developed argument as to either point. That is likely because courts reject her first contention, writing that the "medical opinions are consistent with each other does not, in and of itself, establish that any of the opinions were entitled to great weight or that the ALJ erred." *Hughes v. Kijakazi*, No. 21-CV-367, 2022 WL 4103194, at *12 (W.D. Wis. Sept. 8, 2022). In other words, multiple "flawed opinions do not equal a good one." *Cassens v. Saul*, No. 19-cv-912, 2020 WL 3316094, at *3 (W.D. Wis. June 18, 2020). As to Plaintiff's self-reports, the ALJ did consider them—but to Plaintiff's dismay, found them to be inconsistent with the opinions rather than in support of. (*See* R. at 3375) ("Overall, the opinions rendered . . . are not supported by . . . the claimant's reported . . . functionality."). As

21

exacerbation does not indicate that baseline functioning is not seriously limited." (Doc. 12 at 22). She complains that the ALJ distorted evidence and reached an "absurd result." (Doc. 12 at 23). The Seventh Circuit has directed ALJs to consider that individuals suffering from mental illness may have "good days and bad days, and possibly good and bad months." *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008). An ALJ should remember that symptoms may fluctuate when evaluating inconsistencies. *Quinones v. Colvin*, No. 15 CV 6072, 2017 WL 337993, at *4 (N.D. Ill. Jan. 23, 2017) (citing SSR 16-3p). The entire record must be considered, including those parts that do not support the ultimate determination. *Scrogham v. Colvin*, 765 F.3d 685, 697 (7th Cir. 2014). As discussed, the ALJ cited both evidence that supported his conclusion and undermined it, acknowledging Plaintiff's worsened symptoms and inappropriate displays of behavior. (R. at 3371–74). This means that the ALJ did not run afoul of what was required of him under the regulations and relevant caselaw. This Court finds it difficult to construe Plaintiff's argument as anything more than an impermissible request to reweigh the medical evidence in her favor.

As the Seventh Circuit recently explained, "[a]ll we require is that ALJs provide an explanation for how the evidence leads to their conclusions that is sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [Plaintiff] meaningful judicial review." *Warnell*, 97 F.4th

---

this Court's role does not include reweighing the evidence, it must find this argument unpersuasive, as well. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999) (rejecting an invitation to reconsider medical evidence).

at 1054 (citation and internal quotation marks omitted). This Court can readily observe that the ALJ considered the relevant factors and can follow his path of reasoning. Plaintiff's arguments to the contrary are not convincing. Therefore, the ALJ did not err in his analysis of the medical opinions and remand is not warranted on this issue.

## II.   Clarification of Medical Opinions

Plaintiff's final argument is that the ALJ failed to seek further clarification from the medical providers, and especially from NP Bowald. (Doc. 12 at 23–24). She puts forth that if the ALJ "was so convinced that the nature of the forms was simply insufficient to provide him enough information," he could have contacted NP Bowald to ask for clarification. (Doc. 12 at 24). In support, she cites *Barnett v. Barnhart* for the contention that "although a medical opinion on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion and should recontact the doctor for clarification if necessary." 381 F.3d 664, 669 (7th Cir. 2004) (citation omitted).

An ALJ is required to develop the record only when there is insufficient evidence to determine whether Plaintiff is disabled under the Act. 20 C.F.R. § 416.920b. Evidence is insufficient "when it does not contain all the information we need to make our determination or decision." 20 C.F.R. § 416.920b(b). Here, the ALJ complained that the medical opinions lacked specifics beyond mere generalizations, not that the providers failed to provide information necessary to the determination. *See, e.g., Lisa M.F. v. Comm'r of Soc. Sec.*, No. 122CV01419, 2023 WL 9511468, at *6 (C.D. Ill. Aug. 30, 2023) (cleaned up) (rejecting an argument that an ALJ should have

23

sought clarification when he only indicated a medical opinion lacked specificity); *Joseph M. v. Saul*, No. 18 C 5182, 2019 WL 6918281, at *15 (N.D. Ill. Dec. 19, 2019) ("What is more, an ALJ is generally under no 'affirmative duty' to contact a claimant's physician to obtain a medical opinion."). Because the ALJ could have contacted NP Bowald, but was not required to under the regulations, Plaintiff's final argument is unpersuasive.

For all these reasons, the ALJ provided sufficient analysis for finding the opinions of NP Bowald, APN Flori, and Case Manager Amdor as inconsistent with and unsupported by the objective medical record. As all of Plaintiff's arguments are rejected, the relief requested in her Brief (doc. 12) is denied. Although this Court is sympathetic to Plaintiff's situation, it must remain mindful of the deference underpinning the substantial-evidence standard and affirm a decision if it is adequately explained and supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

## CONCLUSION

IT IS THEREFORE ORDERED that the relief sought in Plaintiff's Brief (doc. 12) is DENIED, while the relief sought in the Commissioner's Brief (doc. 16) is GRANTED. The decision of the ALJ is AFFIRMED. As all issues have been disposed of, this matter is TERMINATED.


SO ORDERED.

Entered this 23rd day of September 2024.

24

s/ Joe B. McDade
JOE BILLY McDADE
United States Senior District Judge